**2023 IL 127805**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

(Docket No. 127805)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v.
TRUMANE TOMPKINS, Appellant.

*Opinion filed February 17, 2023.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Holder White and Cunningham concurred in
the judgment and opinion.

Justice Neville dissented, with opinion.

Justices Rochford and O'Brien took no part in the decision.

## OPINION

¶ 1     Defendant, Trumane Tompkins, appeals his conviction for unlawful use or
possession of a weapon by a felon. 720 ILCS 5/24-1.1(a) (West 2018). On appeal,

he argues that the Cook County circuit court erred in declining to give the jury a non-Illinois Pattern Jury Instruction (non-IPI) pursuant to section 10-30 of the Law Enforcement Officer-Worn Body Camera Act (Act) (50 ILCS 706/10-30 (West 2018)) and admitting body camera footage showing marijuana belonging to defendant's coarrestee. For the following reasons, we affirm.

¶ 2                                                    BACKGROUND

¶ 3                                              A. Motion *in Limine*

¶ 4        Prior to trial, defendant filed a motion *in limine*, seeking, *inter alia*, to prohibit the State from presenting any evidence, whether by testimony or video, regarding the recovery of marijuana that was allegedly possessed by a coarrestee at the time of defendant's arrest. At the start of trial, the State informed the circuit court that it had no intention of introducing any evidence regarding the marijuana. At that time, defendant made the circuit court aware that one of the two body camera videos the State intended to show depicts one officer throwing a bag of marijuana at another officer. Defendant argued that he was not charged with possession of the marijuana, and there was no allegation he had anything to do with the marijuana. Defendant argued that he would be prejudiced by playing that part of the video for the jury because it could cause an inference in the jury's minds that the marijuana belonged to him.

¶ 5        In response, the State argued that the footage at issue was part of a continuous video and, immediately after the video depicts the bag of marijuana, the video depicts the gun that is the subject of defendant's charge on the ground where it was located. Within seconds, the officer that ultimately inventories the gun on his body camera enters the frame of the video and sees the gun. The State represented to the circuit court that excluding the video in its entirety would be cutting off a very relevant portion of the video and that "it [i]s so close in time and proximity it would be hard to cut that part out." The State argued that defendant's concerns could easily be remedied by establishing that a codefendant was arrested for possession of the marijuana and that the marijuana was not in the possession of defendant.

¶ 6        In reply, defendant argued that the State intended to show another, shorter video that depicts the gun being found where it is lying on the ground and picked up by

another officer. Defendant asked the circuit court to limit the State to the showing of that video. The circuit court denied the motion *in limine*, stating that it was "not going to make the State's decisions with respect to what video is better or worse from a persuasive standpoint."

¶ 7                                    B. Jury Trial

¶ 8                                 1. Opening Statement

¶ 9        During defendant's opening statement, counsel stated the following:

"There are two body camera videos. Those are videos that are from a camera that's mounted on an officer's uniform whether it's on their chest or on their left belt or somewhere along those lines. Those two body camera videos will not show Mr. Tompkins [d]oing anything. In fact, they will not show Mr. Tompkins at all.

Interestingly enough, Officer Martinez, the only officer that allegedly sees Mr. Tompkins with a gun[,] will not have any video to show you; and that is because although he was wearing a body camera it was not active, it was not turned [on] when this incident occurred, so we will have videos that will not show Mr. Tompkins doing anything."

¶ 10                                  2. Officer Opacian

¶ 11       Officer Piotr Opacian testified he is an officer with the Chicago Police Department. He was on duty at 11 p.m. on April 23, 2018, along with his partner, Officer Amaris Furlan, in a marked police vehicle, when he observed a vehicle with an inoperable license plate light. He attempted to pull the vehicle over by activating the lights and sirens on his squad car. The vehicle slowed down and began to pull over but then took off at a very high rate of speed. He followed the vehicle and observed the vehicle disobey a red light and almost T-bone a car at the intersection. Officer Opacian then turned off his lights and sirens and slowed down due to public safety concerns but continued to follow the vehicle. The vehicle violated multiple stop signs before he lost sight of the vehicle for a few seconds. When he regained sight of the vehicle, it had crashed into a house and fence. Three occupants exited

from the vehicle and fled in separate directions on foot. Officer Opacian observed defendant exit from the rear of the vehicle. Officer Opacian then parked the vehicle, and he and Officer Furlan proceeded to pursue the suspects on foot. A video of Officer Opacian's squad car dash camera footage was played for the jury.

¶ 12    Officer Opacian testified that, as he exited his vehicle to pursue the suspects, an assisting squad car arrived on scene and drove in the direction of where defendant had run. Officer Constantino Martinez was driving that vehicle, and Officer Opacian soon learned that Officer Martinez had defendant in custody and that a weapon had been located near where defendant was apprehended. He went to the area and observed a red and black Glock 22, .40-caliber gun with an extended magazine. It was located between two apartment buildings behind a fence in the front gangway area. The magazine of the gun had 19 live rounds, and there was 1 live round in the chamber. He collected, disabled, bagged, and sealed the gun and placed it into evidence inventory at the station.

¶ 13    A clip of Officer Opacian's body camera footage showing him recovering the gun was then played for the jury. Officer Opacian testified that marijuana found on scene and briefly depicted in the video was from a different individual who had exited the vehicle, and not defendant. Officer Opacian then identified the gun, magazine, and ammunition in open court, and they were admitted into evidence. He testified that this was the first time he had ever seen a red Glock before, or a red handgun of any brand.

¶ 14    On cross-examination, Officer Opacian testified that police officers must follow certain rules with respect to their body cameras. He testified that officers are required to turn on the cameras anytime they are engaged "in some sort of stop," including a foot pursuit, and to turn the camera on, they must press a button twice. The camera then backtracks one minute and begins recording. Although he saw defendant, wearing a T-shirt, exit the vehicle and begin running, he did not observe the gun or any lumps or bulges in his clothing at that time. Officer Opacian reiterated that someone other than defendant was arrested for the cannabis observed on the video and that it was not recovered near where the gun was recovered.

¶ 15                              3. Officer Martinez

¶ 16        Officer Constantino Martinez testified he was a Chicago police officer and was working with his partner, Katie Blocker, on the night in question. They were on duty in plainclothes but with marked tactical vests and an unmarked squad car when they received a call to assist with a traffic stop. Officer Martinez testified that he located Officer Opacian's police vehicle in pursuit of a fleeing vehicle and followed a safe distance behind. They lost sight of the fleeing vehicle, and when they found it again, it was crashed into a house. Officer Martinez saw the female driver and a male rear passenger flee from the vehicle. He then engaged in a foot pursuit of the male, whom he identified in court as defendant.

¶ 17        Officer Martinez testified that, as he pursued defendant, he observed him running at a fast pace and holding his waistband "like he was holding something, and he was trying to retrieve it from wherever he had it in his front waistband." He continued to run, and once he was finally able to retrieve the item from his front waistband, Officer Martinez saw him toss a black and red object. This occurred around 7111 South Champlain Avenue, in a front yard "with some steps and a black gate which was locked in front." Defendant tossed the object over the gate. He then stopped and raised his hands up in the air. Officer Martinez then detained him and placed him in handcuffs.

¶ 18        Officer Martinez testified that he was running 10 to 15 feet behind defendant when he saw him toss the object. There were no civilians in the area. He relayed the information to his partner, Officer Blocker, who searched that area and found the gun in the yard at that address, 10 to 15 feet away from where Officer Martinez had detained defendant.

¶ 19        The State engaged Officer Martinez in a line of questioning regarding his body camera:

          "Q. Officer, on [the night in question] were you wearing a Chicago Police Department issued body camera?

          A. Yes.

          Q. Prior to [the night in question] had you worn a body-worn camera before?

A. Yes.

Q. Okay. Can you describe how the body-worn cameras are activated and begin recording?

A. We have to manually press the body-worn camera, the middle button twice to activate the camera to start recording.

Q. Okay. And was your camera that you were wearing on [the night in question], did it capture the events of [the night in question]?

A. No.

Q. And why is that?

A. Due to the spontaneous nature of the event, everything happened so quickly, so fast. I was more worried about the safety of my partners and the erratic driving. I wasn't thinking about turning my camera on at the time.

Q. When you were first in your vehicle driving and following the other Chicago police squad car your body-worn camera was not activated?

A. It was not.

Q. In your experience as a Chicago police officer do you typically keep your body-worn camera on as you're just driving around in your squad car?

A. No.

Q. When is it that you would activate a body-worn camera?

A. [When w]e do a stop or we go to a call or we conduct a traffic stop you turn it on from start to end.

Q. And when you say a traffic stop, what do you mean? Like for a traffic infraction?

A. For a traffic infraction and you pull over a vehicle I turn my camera on right when I step out the door.

Q. Step out the door of your vehicle?

A. Yes.

Q. A traffic infraction is typically—do you consider that an emergency situation?

A. No.

Q. Okay. In a situation on [the night in question] when you jumped out of your vehicle did it occur to you to manually turn your body-worn camera on?

A. Not at the time.

Q. And why is that?

A. Everything happened so fast, the driving, the safety of others, making sure nobody gets hurt and then placing the car in park and trying to catch the subjects fleeing from the vehicle."

¶ 20　　On cross-examination, defense counsel questioned Officer Martinez further about the Chicago Police Department's policies regarding body cameras. He testified that those policies include turning on the camera during a foot pursuit when it is safe and feasible to do so. He testified that his partner, Officer Blocker, was wearing a body camera at the time and was able to turn hers on, but he did not. He did not turn it on when he exited the vehicle, nor when he saw defendant toss the gun. Defense counsel asked Officer Martinez whether the camera would have backed up 30 seconds and recorded the toss had he done so, to which Officer Martinez answered as follows:

"A. Maybe, maybe not. It's just one angle. You can't really see everything. It's down here (Indicating). There's like a—the camera—everyone believes that what you see is what you get, but you only see one part of the angle and you can't really see the whole view because my eyes would see something different than my camera sees."

¶ 21　　　　　　　　　　　　　4. Officer Blocker

¶ 22　　Officer Katie Blocker testified that she was working with Officer Martinez on the night in question. They assisted another unit that was pursuing a vehicle that

did not comply with a traffic stop. When they came upon the vehicle crashed into the house, she observed a black male exit the vehicle and cross the street, at which time Officer Martinez exited and ran after him. She exited and ran after Officer Opacian, who was running on the opposite side of the street from Officer Martinez. She was running parallel to Officer Martinez and could see him in her peripheral vision. She saw Officer Martinez apprehend the black male he was chasing and went over to assist him. Officer Martinez then told her that he saw the individual throw something red and pointed to the area where he had apprehended the individual. At that time, she searched the immediate area and, within seconds, saw the red object, which was the gun. There were no other individuals around. She called another officer over to recover the gun.

¶ 23                           5. Stipulation and Jury Instruction Conference

¶ 24        The parties stipulated that defendant was previously convicted of a qualifying felony as a predicate for an unlawful use or possession of a weapon by a felon. 720 ILCS 5/24-1.1(a) (West 2018). The State rested, and defendant put on no additional evidence, waiving his right to testify on the record. The circuit court then held a conference on jury instructions.

¶ 25        During the jury instruction conference, defendant tendered the following non-IPI instruction:

> "You have heard testimony that Officer Martinez was wearing a body-worn camera but did not turn it on prior to or during his encounter with the defendant. If you find that the officer intentionally did not capture a recording of this encounter, then you should consider that fact when determining what weight to give to Officer Martinez's testimony."

¶ 26        Defendant argued before the circuit court that this non-IPI jury instruction was appropriate based on section 10-30 of the Act (50 ILCS 706/10-30 (West 2018)) because Officer Martinez testified that he had not turned on his body camera and had not provided a reasonable justification for his failure to do so. According to defendant, based on that testimony, the jury should be instructed that it can draw a "negative inference" from that fact. The State objected to the instruction, and the circuit court sustained the objection. The circuit court reasoned, *inter alia*, that the

State provided a reasonable justification for Officer Martinez's failure to activate the camera, due to the exigencies of the circumstances.

¶ 27                                6. Closing Arguments

¶ 28     During defense counsel's closing argument, counsel asserted that the State had failed to prove beyond a reasonable doubt that defendant possessed a weapon because

> "nobody ever saw [defendant] with that gun and the only individual, the only police officer who saw [defendant], allegedly, with what he suspected to be that gun, did not turn on his body-worn camera as is required. It's required of him professionally and he didn't do that and because of that, the State has failed to meet its burden."

¶ 29     Defense counsel continued:

> "Now, at best, Officer Martinez allegedly saw [defendant] with a red object, and yet, prior to this, prior to him allegedly seeing [defendant] throw this red object, Officer Martinez said he had a front view of [defendant] when he exits the vehicle and he exits the vehicle and he chased him and he doesn't see him with that gun and then at some point, he sees him throw an object, a red object he says, but he didn't turn on his body-worn camera, so we don't really know what happened. We don't really know what he saw and if he had pressed that button when he allegedly saw [defendant] throw this red item, you would have that video before you today because, as you heard, the body-worn camera, when you pressed that button, when you pressed that button, it buffers, so it goes back 30 seconds and you would have before you—if he pressed that button, you would have saw, whether it shows something or it doesn't, but he didn't do what he was supposed to. He didn't follow the rules. He didn't follow the rules that day and so you don't know what he saw ***."

¶ 30     A little further on in closing, defense counsel returned to the body-camera issue, stating:

> "Now, I want to just briefly touch on the body-worn camera issue. It is not an afterthought. It is required by Chicago Police Department officers to wear

- 9 -

that body-worn camera and the officers that you saw and you heard testimony from, they followed that requirement. They followed that rule, but Officer Martinez did not. He did not do his job that night. He has been wearing that body-worn camera for three years and you heard Officer Opacian testify that in order to turn that body-worn camera on, you double click it and you saw that he was engaged in that chase for several minutes or at least a minute on the road and then he gets out of his vehicle and he's saying that he thinks [defendant] has something in his waistband, but he doesn't turn his body-worn camera on. [He d]id not follow the rules and why is that important? Because if he had, you would have that information that you need before you make your decision, but he didn't. He didn't do what he was supposed to do that night and because of that, the State cannot meet their burden. This is a serious charge and they have to get it right."

¶ 31    In rebuttal, the State emphasized to the jury that Officer Martinez was not on trial and that he had explained the circumstances and why he had not activated his camera. The State also pointed out that the jury did not know what would have been on that camera if it had been turned on, since Officer Martinez was running at the time. The State explained to the jury that the pertinent question was whether to believe Officer Martinez's testimony.

¶ 32                    7. Jury Instructions and Verdict

¶ 33    Following closing arguments, the circuit court advised the jury of the relevant instructions. The circuit court instructed the jury, *inter alia*, as follows. The jurors are to determine the facts and to determine them only from the evidence in this case, in light of their own observations and experience in life. The evidence the jurors are to consider consists only of the testimony of the witnesses and the exhibits and stipulations that the circuit court had received. Only the jurors are the judges of the believability of the witnesses and the weight to be given to the testimony of each of them. In considering the testimony of any witness, the jurors are to take into account the witness's ability and opportunity to observe; his memory; his manner while testifying; any interest, bias, or prejudice he may have; and the reasonableness of his testimony considered in light of all the evidence in the case. Following a period of deliberation, the jury returned a verdict finding defendant

guilty of unlawful possession of a weapon by a felon.

¶ 34                         8. Posttrial Proceedings

¶ 35        Following trial, defendant filed a posttrial motion raising the issues we now consider in this appeal. Following a sentencing hearing, the circuit court sentenced defendant to 7½ years in the Department of Corrections, plus two years' mandatory supervised release, with 332 days' credit for pretrial custody.

¶ 36                   C. Proceedings in the Appellate Court

¶ 37        Defendant appealed his conviction, raising the same issues that we address here. The appellate court affirmed in an unpublished order pursuant to Illinois Supreme Court Rule 23(b) (eff. Jan. 1, 2021). 2021 IL App (1st) 190693-U. The appellate court found that the circuit court did not err in refusing to give the proposed non-IPI instruction because it was an inaccurate statement of the law as stated in section 10-30 of the Act. *Id.* ¶ 30. Further, the appellate court found that, while it was error to admit the video evidence depicting the marijuana, the error was harmless. *Id.* ¶ 41. This court allowed defendant's petition for leave to appeal. See Ill. S. Ct. R. 315 (eff. Oct. 1, 2021).

¶ 38                              ANALYSIS

¶ 39        Before this court, defendant raises two issues: (1) whether the circuit court erred in refusing to give the non-IPI instruction regarding Officer Martinez's failure to activate his body camera and (2) whether the circuit court erred in admitting video evidence of marijuana recovered from a coarrestee. We will address each issue in turn.

¶ 40                        A. Non-IPI Instruction

¶ 41                         1. Standards of Review

¶ 42        The relevant standards for our review of the circuit court's decision on whether to give a non-IPI jury instruction are well established. That decision rests within

- 11 -

the sound discretion of the circuit court. *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). However, "[a] defendant is entitled to an instruction on his theory of the case if there is some foundation for the instruction in the evidence [citation], and if there is such evidence, it is an abuse of discretion for the [circuit] court to refuse to so instruct the jury [citation]." *People v. Crane*, 145 Ill. 2d 520, 526 (1991). In addition, whether the circuit court has abused its discretion will depend on whether the non-IPI instruction is an accurate, simple, brief, impartial, and nonargumentative statement of the law. *Bannister*, 232 Ill. 2d at 81. The question of whether a jury instruction is legally correct is reviewed *de novo*. *People v. Hartfield*, 2022 IL 126729, ¶ 45.

¶ 43                         2. Applicability of Section 10-30 of the Act

¶ 44        Here, defendant's tendered instruction was based upon section 10-30 of the Act (50 ILCS 706/10-30 (West 2018)), which provides, with respect to recordings made from officer-worn body cameras, as follows:

> "§ 10-30. Evidence. The recordings may be used as evidence in any administrative, judicial, legislative, or disciplinary proceeding. If a court or other finder of fact finds by a preponderance of the evidence that a recording was intentionally not captured, destroyed, altered, or intermittently captured in violation of this Act, then the court or other finder of fact shall consider or be instructed to consider that violation in weighing the evidence, unless the State provides a reasonable justification."

¶ 45        Defendant argues that the plain language of section 10-30 of the Act, quoted above, requires that the jury, as the finder of fact, be instructed in accordance with that section in any case where there is some evidence to support a theory that a testifying police officer failed to activate his body camera in violation of the Act. We agree.

¶ 46        At the time of defendant's arrest, section 10-15 of the Act (*id.* § 10-15) provided that any law enforcement agency that employs the use of officer-worn body

cameras is subject to the provisions of the Act.[1] The Act requires the Illinois Law Enforcement Training Standards Board (Board) to develop basic guidelines for the use of officer-worn cameras, which shall be the basis for a written policy that all law enforcement agencies must adopt. *Id.* § 10-20(a). Such policies are required to include a provision that "[c]ameras must be turned on at all times when the officer is in uniform and is responding to calls for service or engaged in any law enforcement-related encounter or activity, that occurs while the officer is on duty." *Id.* § 10-20(a)(3). In addition, the policy must include a provision that, "[i]f exigent circumstances exist which prevent the camera from being turned on, the camera must be turned on as soon as practicable." *Id.* § 10-20(a)(3)(A). Accordingly, as the Chicago Police Department had implemented the use of body-worn cameras, Chicago Police Department Special Order S03-14, issued October 17, 2017, and titled "Body Worn Cameras," provided in section III(A)(2)(e) that

> "[t]he Department member will activate the system to event mode at the beginning of an incident and will record the entire incident for all law-enforcement-related activities. If circumstances prevent activating the [body camera] at the beginning of an incident, the member will activate the [body camera] as soon as practical. Law-enforcement-related activities include but are not limited to:
>
> * * *
>
>     e. foot and vehicle pursuits." Chi. Police Dep't Special Order S03-14, § III(A)(2)(e) (eff. Oct. 17, 2017).

¶ 47    Here, Officer Martinez testified that he did not activate his body camera prior to embarking on the foot pursuit of defendant nor at any time prior to apprehending defendant and placing him under arrest. Accordingly, there was some evidence of the applicability of section 10-30 of the Act, and defendant was entitled to a jury instruction pursuant to that section. See *Crane*, 145 Ill. 2d at 526. Thus, we turn to

---

[1]Effective December 6, 2022, section 10-15 of the Act has been amended to provide that all law enforcement agencies must employ the use of officer-worn body cameras in accordance with the provisions of the Act and must implement the use of body cameras for all law enforcement officers according to a schedule set forth therein based on the population of the county or municipality, with all agencies in the state in compliance by January 1, 2025. See Pub. Act 102-1104, § 30 (eff. Dec. 6, 2022) (amending 50 ILCS 706/10-15).

the issue of whether defendant's tendered non-IPI jury instruction accurately stated the law as set forth by that section. See *Bannister*, 232 Ill. 2d at 81. We find that it does not.

¶ 48                          3. Required Elements of Instruction

¶ 49       Pursuant to the plain language of section 10-30, the "court or other finder of fact" is required to consider all the propositions set forth in that section. 50 ILCS 706/10-30 (West 2018). The fact finder would be a court in the case of a bench trial and the jury in the case of a jury trial. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (in a bench trial, the circuit judge sits as the finder of fact). In the case at bar then, where defendant was tried by jury, it was for the jury to decide the following: (1) whether, applying a preponderance of the evidence standard, Officer Martinez intentionally failed to activate his body camera; (2) if the jury answered the first inquiry in the affirmative, whether the State provided a reasonable justification for such intentional failure; and (3) if the jury answered the second inquiry in the negative, how such intentional failure without reasonable justification impacts the weight to be given Officer Martinez's testimony.[2]

¶ 50       Here, defendant's tendered jury instruction did not require the jury to consider the reasonableness of the justification given by the State through Officer Martinez's testimony but rather instructed the jury to consider the failure of Officer Martinez to activate the body camera in weighing his testimony if it found the failure was intentional. Defendant argues that instructing the jury to consider whether the State provided a reasonable justification for the failure of Officer Martinez to activate his body camera would be redundant because the lack of reasonable justification is

---

[2]It is important to note that, despite the parties' labeling the instruction required by section 10-30 of the Act as one that instructs the jury to make an adverse inference in the circumstances defined therein, this is not an accurate label. A true adverse inference instruction directs the jury to infer that evidence is adverse to that party if certain conditions are met. See *Marsh v. Sandstone North, LLC*, 2020 IL App (4th) 190314, ¶ 25 (discussing Illinois Pattern Jury Instructions, Civil, No. 5.01 (approved Dec. 8, 2011), also known as the missing witness or adverse-inference instruction). The instruction required by section 10-30 does not require an adverse inference but instead gives the jury discretion to determine the weight to give an officer's failure to turn on a body camera using the considerations set forth therein. Thus, even if the jury concluded that Officer Martinez intentionally failed to activate the camera and there was no reasonable justification, the jury was free to give that fact the weight it felt it should be given in determining Officer Martinez's credibility.

- 14 -

equivalent to intentionality. We disagree.

¶ 51                                  4. Intentionality Versus Justification

¶ 52        The General Assembly, when it drafted section 10-30, included the intentionality of the officer's conduct and the lack of reasonable justification as two separate considerations, leaving the determination of each to the finder of fact. "An established principle of statutory interpretation provides that every clause of a statute must be given a reasonable meaning, if possible, and should not be rendered meaningless or superfluous." *Schultz v. St. Clair County*, 2022 IL 126856, ¶ 27. Indeed, the plain meaning of the terms differs. Something is done (or not done) "intentionally" if it is done (or not done) purposefully and not by accident. Black's Law Dictionary 810 (6th ed. 1990). Conversely, "justification" signifies a showing of a sufficient reason for an action (or inaction). *Id.* at 865. Thus, the jury is tasked with determining first whether Officer Martinez purposefully, and not accidentally, failed to activate his camera. If the jury found that it was purposeful, the jury was to consider whether Officer Martinez's failure to act was reasonably justified.

¶ 53                                  5. Tendered Instruction Inaccurate

¶ 54        Because defendant's tendered jury instruction did not instruct the jury to consider whether Officer Martinez's failure to activate his body camera was reasonably justified, it was not an accurate statement of the law. While it follows that the circuit court legally erred in denying the instruction based on its finding that the State provided a reasonable justification, that error was invited by defendant's failure to include that element in the tendered instruction. See *People v. Ligon*, 2016 IL 118023, ¶ 28 (party may not advance a theory or argument on appeal that is inconsistent with the position taken below). Moreover, this court may affirm on any basis provided by the record, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct. *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 16. For these reasons, the circuit court's refusal to give that instruction was not an abuse of discretion. See *Bannister*, 232 Ill. 2d at 81. Nevertheless, we recognize the General Assembly's intention that the jury in cases such as these be instructed according to the terms of section 10-30 of the Act in appropriate cases and thus encourage the

- 15 -

development of a pattern instruction by the Committee on Jury Instructions in Criminal Cases.

¶ 55                                6. Alternative Harmless Error

¶ 56        While we find no abuse of discretion in refusing the tendered instruction, we further note the well-established principle that an error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed. *People v. Mohr*, 228 Ill. 2d 53, 69 (2008). We find this to be the case based upon the record here. First, it is clear from the record that the jury was instructed to "consider all the evidence in light of [its] own observations and experience in life" and to weigh and consider each witness's testimony "in light of all the evidence in the case." Here, that evidence included the evidence that Officer Martinez had not turned on his body camera and that officers are generally required to activate their body camera during a pursuit. We agree with the State that defense counsel repeatedly directed the jury to focus on this failure on the part of Officer Martinez in determining his credibility. In so doing, the jury had before it Officer Martinez's explanation for that failure. Thus, the jury necessarily considered this evidence in determining the weight to give Officer Martinez's testimony pursuant to the instructions that it was given, even though it was not specifically instructed to do so pursuant to section 10-30.

¶ 57        Moreover, we agree with the State that any error did not affect the outcome of the trial due to the strong circumstantial evidence of defendant's guilt. Officer Martinez's testimony that he saw defendant throw the gun over the fence was strongly corroborated by the testimony of the other officers, who all identified the gun that was lying feet from where defendant was apprehended after Officer Martinez directed them to the area. The other officers' body camera evidence also corroborated the testimony. Accordingly, even if the jury were specifically instructed to consider Officer Martinez's failure to activate his body camera in assessing his credibility, the jury would have considered the corroborating evidence and convicted defendant. For this alternative reason, defendant is not entitled to relief. See *id.*

¶ 58                          7. Video Evidence of Marijuana

¶ 59       Finally, defendant takes issue with the admission of the video evidence depicting marijuana that was recovered from a coarrestee. This video evidence was before the jury as part of the body camera footage showing the recovery of the gun. We agree with the appellate court that admission of this portion of the video was error, and the footage should have been deleted from the video shown to the jury, as it was irrelevant and unduly prejudicial. 2021 IL App (1st) 190963-U, ¶¶ 37-40. However, we also agree with the appellate court that the admission of such evidence was harmless. *Id.* ¶ 41.

¶ 60       In ascertaining whether an evidentiary error is harmless, the following considerations are relevant. First, with a focus on the error, the reviewing court must determine whether it might have contributed to the conviction. *People v. Salamon*, 2022 IL 125722, ¶ 121. Second, the reviewing court must examine the other evidence in the case to see if overwhelming evidence supports the conviction. *Id.* Finally, the reviewing court must determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence. *Id.*

¶ 61       Here, the video evidence of the marijuana was not duplicative of properly admitted evidence. However, we agree with the appellate court that " 'no reasonable probability exists that the verdict would have been different had the irrelevant evidence been excluded.' " 2021 IL App (1st) 190693-U, ¶ 41 (quoting *People v. Lynn*, 388 Ill. App. 3d 272, 282 (2009)). Moreover, any prejudicial impact was greatly lessened by Officer Opacian's testimony immediately after it was shown, explaining that the marijuana did not belong to defendant. Moreover, the evidence was overwhelming, considering the corroborating testimony of the other officers and the recovery of the gun within feet of defendant's arrest in plain view just over the fence where Officer Martinez testified that he saw defendant toss the gun. For these reasons, we decline to disturb the jury's verdict based on the improper admission of this portion of the video footage.

¶ 62                                   CONCLUSION

¶ 63       For the foregoing reasons, we hold that the evidence required that the jury be instructed in accordance with section 10-30 of the Act. 50 ILCS 706/10-30 (West

- 17 -

2018). However, the jury instruction tendered by defendant was an inaccurate statement of the law because it did not require the jury to consider whether the State provided a reasonable justification for Officer Martinez's failure to activate his body camera in addition to considering whether such evidence was intentional. Thus, the circuit court did not abuse its discretion in refusing the instruction. In addition, any instructional error was harmless because it did not affect the outcome of the trial. The same is true for the improperly admitted evidence depicting the marijuana recovered from defendant's coarrestee. Accordingly, we affirm the decisions of the courts below and thus defendant's conviction.

¶ 64        Affirmed.


¶ 65        JUSTICE NEVILLE, dissenting:

¶ 66        The Law Enforcement Officer-Worn Body Camera Act (Act) (50 ILCS 706/10-30 (West 2018)) provides the "finder of fact *** shall *** be instructed to consider" evidence that an officer intentionally decided not to capture a body camera recording of an encounter related to law enforcement. Although an officer admitted he did not turn on his body camera during such an encounter, the trial court, in violation of the Act, decided not to instruct the jury on how to consider that evidence. I would find that the trial court's failure to give a section 10-30 instruction constituted reversible error. Therefore, I respectfully dissent.


¶ 67                            BACKGROUND

¶ 68        The legislature adopted the Act to "provide impartial evidence and documentation to settle disputes" about what happened in encounters between police and citizens. *Id.* § 10-5. Section 10-20 of the Act provides that "[c]ameras must be turned on at all times when the officer is in uniform and is responding to calls for service or engaged in any law enforcement-related encounter or activity, that occurs while the officer is on duty." *Id.* § 10-20(a)(3). Officer Martinez testified that he forgot to turn on his body-worn camera when he exited his vehicle to chase the defendant. Officer Martinez violated section 10-20 of the Act.

- 18 -

¶ 69    Defense counsel brought the Act to the trial court's attention. Section 10-30 of the Act provides:

> "If a *** finder of fact finds by a preponderance of the evidence that a recording was intentionally not captured *** in violation of this Act, then the *** finder of fact shall *** be instructed to consider that violation in weighing the evidence, unless the State provides a reasonable justification." *Id.* § 10-30.

Defense counsel proffered the following instruction that largely followed the language of the statute:

> "You have heard testimony that Officer Martinez was wearing a body-worn camera but did not turn it on prior to or during his encounter with the defendant. If you find that the officer intentionally did not capture a recording of this encounter, then you should consider that fact when determining what weight to give to Officer Martinez's testimony."

¶ 70    The trial court did not instruct the jury to consider Officer Martinez's admitted violation of the Act in determining the weight to give his testimony.

¶ 71                                    ANALYSIS

¶ 72    The trial court has a duty "to accurately instruct the jury as to the law to be applied in a given case." *People v. Watson*, 26 Ill. App. 3d 1081, 1085 (1975). We review *de novo* the issue of whether the jury instructions accurately conveyed to the jury the applicable law. *People v. Parker*, 223 Ill. 2d 494, 501 (2006). "We must determine whether the instructions, taken as a whole, fairly, fully, and comprehensively apprised the jury of the relevant legal principles." *Id.*

¶ 73    Section 10-30 provides that the jury "shall *** be instructed" to consider the violation of the Act in assessing the officer's credibility. By employing the word "shall," the legislature gave "a clear expression of legislative intent to impose a mandatory obligation." *People v. O'Brien*, 197 Ill. 2d 88, 93 (2001). Rule 451(a) authorizes the trial court to modify instructions the parties submit. Ill. S. Ct. R. 451(a) (eff. Apr. 8, 2013); see *People v. Hester*, 131 Ill. 2d 91, 103 (1989) ("[U]nder the rules of this court, the trial court was authorized to modify the jury

instruction. (107 Ill. 2d R. 451).”). I would find the trial court had a duty to amend the proffered instruction to read instead:

> “You have heard testimony that Officer Martinez was wearing a body-worn camera but did not turn it on prior to or during his encounter with the defendant. If you find that the officer intentionally did not capture a recording of this encounter, and you find the State did not provide a reasonable justification for the failure to record the encounter, then you should consider that fact when determining what weight to give to Officer Martinez's testimony.”

¶ 74 The trial court's instructions did not refer to the possible effect of the failure to capture a recording of the encounter on the weight to give Officer Martinez's testimony, and therefore the instructions did not fully and fairly apprise the jury of the relevant legal principles established by section 10-30 of the Act. I would find the trial court erred by failing to amend Tompkins's proffered jury instruction in accord with the applicable law, section 10-30 of the Act.

¶ 75 The majority asserts that any error in the instructions had no prejudicial effect because of the strong evidence of Tompkins's guilt. *Supra* ¶¶ 56-57. I disagree. The State's case against Tompkins depended on the credibility of Martinez, the only witness who claimed to have seen a gun in Tompkins's hand. Martinez had no compelling explanation for his failure to turn on his camera when he saw Tompkins toss the gun, even though he knew the recording would start before the toss and might capture an image of Tompkins tossing the gun. Other officers involved in the same chase managed to turn on their cameras in compliance with section 10-20 of the Act. The State presented no evidence of fingerprints on the gun and no evidence Tompkins wore gloves. The evidence that police found the gun where Martinez pointed supports an inference Martinez saw the gun before the other officers, but all the other officers relied solely on Martinez for the identification of Tompkins as the source of the gun.

¶ 76 The majority notes that defense counsel argued Martinez's failure to turn on the camera made his testimony not credible, and the majority relies on defense counsel's argument as grounds for finding the instruction error harmless. *Supra* ¶ 56. I “find it difficult to believe that the statements and arguments of counsel, referred to by the State above, would have the same impact on the jurors as would the instruction.” *People v. Donald*, 21 Ill. App. 3d 696 (1974); see *People v.*

*Winston*, 160 Ill. App. 3d 623 (1987) (trial court committed reversible error by failing to give accomplice witness instruction, even though defense counsel vigorously attacked the credibility of the accomplice witness).

¶ 77    I find the reasoning of the Alaska Supreme Court, in a similar case, compelling. In *Anthony v. State*, 521 P.2d 486, 491 (Alaska 1974), defense counsel argued at length the jury should not believe the State's principal witness because of her participation in the offense. The trial court refused to instruct the jury on the credibility of accomplice witnesses, despite a rule requiring such a cautionary instruction in appropriate cases. *Id.* On appeal from the subsequent conviction, the *Anthony* court said:

> "But even supposing cross-examination and closing argument to have been devastating, the purpose of the rule is to raise the issue of accomplice credibility above mere adversary colloquy. The giving of the instruction to view the testimony of an accomplice with distrust clothes the issue with the cloak of the judge's impartial authority and thus mandates application of that criterion in the jury's deliberation. For this reason alone, the failure to give the accomplice instruction cannot be regarded as harmless under the circumstances of this case." *Id.*

See *State v. Beene*, 257 N.W.2d 589, 592 (S.D. 1977) (adopting the reasoning of *Anthony*).

¶ 78    The trial court here violated section 10-30 of the Act when it failed to instruct the jurors that, in weighing the evidence, they should consider Martinez's failure to turn on his camera if the jurors found the State failed to prove reasonable justification for that failure. Because the State's case rested entirely on the credibility of the one officer who failed to comply with section 10-20 of the Act, which required him to turn on his camera when pursuing a suspect, I would find the instructional error requires reversal. Accordingly, I dissent.

¶ 79    JUSTICES ROCHFORD and O'BRIEN took no part in the consideration or decision of this case.