2023 IL App (1st) 191353
No. 1-19-1353
Opinion filed June 30, 2023

SIXTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 12 CR 20136 |
| WESLEY WOODSON III, | ) ) | The Honorable Lauren Gottainer Edidin |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justices C.A Walker and Tailor concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant Wesley Woodson III, age 20,[1] was convicted after a jury trial of one count

of first degree murder for the shooting death of 14-year old Dajae Coleman. In addition to the

murder, the jury also found defendant guilty of multiple counts of attempted murder. The

offenses all stemmed from a single shooting incident that occurred shortly after 10:30 p.m. on

Saturday, September 22, 2012, on a street in Evanston, Illinois. For the murder, the trial court

sentenced defendant to the minimum of 45 years, including a 25-year mandatory firearm

_____

[1]This is defendant's age on the date of the offenses.

enhancement. For the attempted murders, the trial court sentenced defendant to the minimum of 26 years, including a 20-year mandatory firearm enhancement. Defendant's total sentence for both the murder and the attempted murders is 71 years.

¶ 2     On this direct appeal, defendant claims, first, that the State failed to prove beyond a reasonable doubt that he was the shooter, where there were allegedly weaknesses in the identifications by the three witnesses who identified him as the shooter, where there was no confession and no physical evidence linking defendant to the shooting, and where a car that sped away from the scene of the shooting could have carried the shooter.

¶ 3     Defendant claims, second, that the State's introduction of gang evidence was excessive. On appeal, defendant does not dispute either that defendant was in a gang or that some evidence was relevant in order to show both that he was in a gang and that his gang was in a conflict with other gangs in Evanston at the time of the shooting. Defendant's claim on appeal is that the State exceeded the relevant amount when it introduced more than a dozen gang-related crimes that defendant was not involved in. For the following reasons, we affirm.

¶ 4     I. BACKGROUND

¶ 5     The State's evidence at trial established that shortly after 10:30 p.m. on September 22, 2012, a shooter opened fire at a group of eight teenagers on a street in Evanston. As a result of the shooting, 14-year old Dajae Coleman died. Three people identified defendant as the shooter. Two of them—namely, Matthew Berquist and Delanio Robinson—knew defendant prior to the shooting.

¶ 6     The State's theory of the case was that defendant shot at the group because he mistakenly believed that they were members of a rival gang. Rival gang members had shot defendant on April 22, 2012. Five months later, on the day of the shooting, defendant's cousin,

Tyrone Usher, was stabbed shortly before the shooting occurred. The defense states in its brief to this court that "the defense never denied that defendant was in a gang."

¶ 7                          A. State's Pretrial Motion to Admit Gang Evidence

¶ 8            Prior to trial, the State filed a motion to admit gang evidence. The State argued that the gang evidence was relevant to establish motive. Although the State is not required to establish motive, the State argued that this evidence was needed to explain an otherwise inexplicable act and to establish a continuing narrative for the events in 2012 that led to the night of September 22, 2012. The State acknowledged that gang evidence was prejudicial but argued that, in this case, it was more probative than prejudicial.

¶ 9            In its motion, the State alleged that (1) defendant and Usher, defendant's cousin, were members of the D Block gang, (2) the D Block gang was in conflict with the O Block gang, (3) the O Block gang had begun recruiting from the ABM and TTG gangs, such that the D Block gang was also in conflict with these groups, (4) an O Block member shot defendant and another D Block member on April 22, 2012, and (5) Usher called defendant's sister, Tiffany Woodson, at 10:32 p.m. on September 22, 2012, to report that he had been stabbed on his way home from a party.

¶ 10            The State asked the trial court to qualify Sergeant Michael Endre of the Evanston Police Department as a gang expert, and the trial court did. On appeal, defendant does not dispute either Endre's qualifications or the relevance of some gang evidence to the issues at trial, so we take these issues as conceded. Instead, defendant argues on appeal that the evidence introduced at trial was excessive and that this excess was more prejudicial than probative.

¶ 11            After listening to Sergeant Endre's testimony at the pretrial hearing, the court heard the parties' arguments on November 8, 2016. The State argued that it had "taken great pains to

reduce the prejudicial impact upon the defendant." The State noted that, although it had evidence of defendant participating in other crimes, it was not seeking "to get into that prejudicial material." Instead, it was "limiting" its motion to "evidence that shows that the defendant was a D Block member, that his cousin, Tyrone Usher, was a D Block member, and the fact that D Block was in conflict with other gangs that summer, and that the defendant was knowledgeable about that." The State repeated that it would not introduce evidence of criminal activity by defendant. As a result, the State argued that its motion was "not a proof of other crimes motion."

¶ 12    After the State finished its argument, the defense stated that it was objecting to all of the proposed gang evidence, as more prejudicial than probative.[2] As already noted, this is not defendant's position on appeal. On November 14, 2016, the trial court issued its ruling from the bench. The trial court found that the State had introduced sufficient evidence to show (1) that defendant was a gang member, specifically of the D Block gang, (2) that he possibly had a motive to kill based on the conflicts between the street gangs in September 2012, and (3) that defendant was shot by a rival gang member in April 2012. The court concluded that "the probative value of the gang evidence with regard to motive and the continuing narrative" of gang violence "exceeds any prejudicial effect." The court explained:

"There was a vicious cycle of gang violence that went on through the spring and summer of 2012. This whole cycle and series of events explains an otherwise

---

[2]The defense argued before the trial court that "[t]he public perception of gang membership is extremely negative" and evidence of gang membership posed "the risk" that the jury "will associate gang membership with a propensity to commit a crime." The defense argued that the victims were not gang members, that this was "a random shooting," and that there was no evidence that the shooter or victims used any gang slogans or signals.

inexplicable act. And I believe it is necessary and that its probative value is much greater than its prejudicial value."

The trial court found that the State had to be able to introduce a basis for Sergeant Endre's testimony, in order to show that he was testifying based on credible evidence. However, it would not allow "overkill."

¶ 13                                    B. Trial

¶ 14        At the trial, which started on September 5, 2017, the State argued in its opening statement that this was a case of "mistaken retaliation." The defense, in its opening, stressed that there was no confession and no physical evidence linking defendant to the shooting. The defense asserted that "the bottom line of this case, the bottom line [in] this is all about witness identification." The defense argued that the witness identifications were unreliable because it was "pitch black," the witnesses saw the shooter for only a second or two, they did not see him face to face, and they were a half a block away from the shooter on a dark street. The defense asked the jury to pay attention to the fact that what the identifying witnesses first told the police later changed, and the defense argued that their initial descriptions were vague because they did not have a good view of the shooter.

¶ 15        The evidence at trial involved three timelines: the timeline of the victims, as they headed on September 22, 2012, to the corner of Church Street and Ashland Avenue, where the shooting took place; the timeline of defendant's whereabouts that same night prior to the shooting; and the timeline of gang activity in the spring, summer, and fall of 2012, as described by Sergeant Endre, the gang expert.

¶ 16        As for the victims, the State's evidence established that a group of teenagers, including the murder victim and trial witnesses Carl Singletary and Delanio Robinson, left a party in

Evanston and eventually headed north on Dodge Avenue toward Lyons Street, where they heard a couple of shots fired. There were two sets of shots fired that night: the first set was fired near Dodge Avenue and Lyons Street at approximately 10:29 p.m.; the second set occurred approximately five or six minutes later at the corner of Church Street and Ashland Avenue. It is the second set that is the subject of this case.

¶ 17 When the first set was fired near Dodge Avenue and Lyons Street, the group of teenagers ran one block south on Dodge Avenue and then turned eastbound onto Church Street. They walked three blocks on Church Street to the corner of Church Street and Ashland Avenue, where the second shooting occurred. The first reports of shots fired at Church Street and Ashland Avenue were received by the police at 10:35 p.m.[3] There was a home on the corner of Church and Ashland; defendant's home was directly north of that corner home. Berquist, one of the three identifying witnesses, lived in the home directly north of defendant's home.

¶ 18 To establish defendant's whereabouts, the State called defendant's sister, Tiffany Woodson; defendant's girlfriend, Jessica Bowman; and Tiffany's friend, Rebecca Olasimbo, who all testified that defendant had been hanging out in the Woodson home on the evening of the shooting, but that he was not in the Woodson home when the shooting occurred. As described in more detail below, they all testified that he returned a couple of minutes after the shooting, by entering through the back door.

¶ 19 Tiffany Woodson, defendant's younger sister, testified that she was at home with defendant and their family, as well as a couple of friends, on the night of September 22, 2012. Tiffany was 18 years old at that time and had already graduated high school. At 10:32 p.m.,

---

[3]The first reports of shots fired at Dodge Avenue and Lyons Street were received by the police, six minutes earlier, at 10:29 p.m. Curt Keumpel, the Assistant Communications Coordinator of the Evanston Police Department, testified regarding the records of Evanston's 911 call center.

she received a call from her cousin Tyrone Usher,[4] who told her that he had just been stabbed and that he wanted Tiffany's parents to come to Evanston Township High School (ETHS) football field to pick him up. Tiffany testified that, when she told her family, including defendant, what Usher had said, defendant appeared "frustrated" and that he stated "[s]omething along the lines of, like, gee, what the f***." After Tiffany's parents and sister Victoria left to pick up Usher, Tiffany went back down to the basement with one of her friends. Tiffany's sister, Amber, came down to the basement, and Amber said she heard shots. Amber turned off the lights in the house and returned to the basement, where Amber asked everyone to gather on the basement stairs for safety. Defendant was not in the basement, and Amber asked where he was.

¶ 20    At first, Tiffany testified that defendant came to the basement from the back of the house *less* than two minutes later. However, she admitted that she had written in a statement to the police that it was *about* two minutes later. On September 26, 2012, when she spoke to police, they told her to write out a summary of what she had told them. Tiffany started writing, but her father called her on her cell phone and told her that he did not feel comfortable with her continuing to speak to the police. When she stopped writing, she initialed where her statement ended, and the police took her home. In court, she identified the statement, and she acknowledged that the statement said that defendant entered the basement about two minutes after she, Amber, and others had hidden there. Tiffany testified that, when defendant entered the basement, he was wearing sweatpants or pajama pants.

---

[4]Sergeant Endre testified, based on his review of phone logs, that the call from Usher's phone to Tiffany's phone was made at 10:31 p.m.

¶ 21　　　　At trial, Tiffany acknowledged speaking with police officers on September 26, 2012, at 12:30 p.m. at the Lincolnwood Police Department. At this time, the officers asked her to take out her phone so that they could see the record of the phone call from Usher. Tiffany denied telling the officers either (1) that, after her parents left the house, defendant started complaining about how he has to stick up for Usher or (2) that defendant and Usher were both members of the D Block gang. Tiffany testified that she did not know if D Block was a gang and that she thought that D Block was a block "where guys hangout." Tiffany acknowledged on the stand that her brother was a member of a gang and testified that the name of his gang was "B.D.," which stood for Blood Disciple. However, she could not say whether Usher was in a gang. Tiffany denied telling police that D Block had recently been having a feud with other gangs. She denied telling police that, six months earlier, defendant showed her a black semi-automatic handgun that he had in his pants pocket. She testified that she had seen a picture of him on Facebook "maybe six months" before September 2012 with a semi-automatic gun. Tiffany denied telling the police that, after defendant was shot on April 22, 2012, he became more irritable and concerned about defending himself. But she acknowledged that, between April 22, 2012, when defendant was shot, and September 22, 2012, the night in question, defendant had slowed down and become "more paranoid." Tiffany denied telling police that defendant was frantic and upset that Usher had been attacked. However, Tiffany acknowledged that, in her statement, she had written that her brother was frantic and upset.

¶ 22　　　　On cross, Tiffany denied seeing her brother in cargo pants on September 22, 2012. When he entered the basement, he seemed fine, and he was not out of breath. When she told the police that she was not going to sign the statement, they told her to initial it to represent the ending of their talk but that the initials did not mean it was an official statement.

¶ 23       Like Tiffany, Jessica Bowman was also at defendant's home on the evening of September 22, 2012. Bowman testified that defendant was then her boyfriend. At about 10:30 p.m., she heard defendant's phone ringing and observed that the caller was Usher. Defendant had left his phone inside the house when he went into the backyard. When defendant returned to the house from the backyard, Bowman did not mention that Usher had called. Tiffany subsequently said that she had received a call from Usher, and the family got together to discuss what to do about Usher. At some point after Bowman heard that Usher had been stabbed, she called her mother. While on the phone with her mother, Bowman heard gunshots that were so loud that her mother heard them through the phone. Defendant was not in the house at the time of the gunshots. A couple of minutes after hearing the gunshots, Bowman saw defendant enter the house through the back door. They were in the living room, and then they went down into the basement. At some point, they came back upstairs, and somebody outside walked up to the house to throw something in the garbage bin. Defendant told the person to leave. A few minutes later, defendant's parents and defendant's sister Victoria returned to the house with Usher.

¶ 24       On cross, Bowman testified that, when defendant's parents and sister Victoria went to pick up Usher, Bowman asked defendant to stay with her and he stayed. At some point, an investigator asked to see her phone, looked at it, and told her that the conversation with her mother had started at 10:35 p.m. Bowman testified that she was on the phone with her mother for a few minutes. During the phone call, Bowman was in the living room, and defendant was not in the living room. He had gone back out to the backyard. At some point, he came back in, and they went down to the basement, with his sisters, Tiffany and Amber. Eventually, they came back upstairs, and Bowman looked out the front window. There were two people

standing in the Woodsons' front yard. One was a man. Defendant went outside, confronted the man, and told him to leave their property.

¶ 25    On redirect, Bowman testified that, after the shots were fired, Bowman later observed defendant reenter the house through the back door. Bowman acknowledged that, to enter the house through the back door, one has to be in the backyard.

¶ 26    Rebecca Olasimbo, Tiffany's friend, testified that she was also at defendant's home on the evening of September 22, 2012, when shots were fired. At that time, she was 18 and had already graduated high school. At some point, Olasimbo and Tiffany were in the basement when Tiffany's cell phone rang. While Olasimbo did not recall a lot of the details of that night, she did recall, after being specifically asked, that she later told an assistant state's attorney (ASA) that Tiffany went upstairs to report the contents of the conversation to Tiffany's parents and that the parents and Victoria left the house to look for Usher. Olasimbo recalled stating that Victoria and her parents were gone for 10 or 15 minutes. Olasimbo agreed that she had told the ASA that, after Victoria and her parents left, she observed defendant exit the home through the front door, and that, 5 to 10 minutes after he left, she was standing by the basement door when she heard multiple shots. After hearing the "loud noise," Olasimbo ran down into the basement because she was scared. Olasimbo agreed that she told the ASA that she was down in the basement with Jessica and defendant's sisters, Tiffany and Amber. Olasimbo agreed that she told the ASA that, after hiding in the basement for a few minutes, she and the other girls came back upstairs, where she observed defendant enter the home through the back door. On cross, Olasimbo stated that while she heard loud noises, she "could infer that it was gunshots." On redirect, Olasimbo acknowledged that on, September 26, 2012, which was four days after the incident, she told an ASA that she observed defendant exit his home through the

front door, that she heard shots fired outside, and that she observed him reenter the home through the back door.

¶ 27    As already noted, the State introduced three identifications. First, Berquist, defendant's next-door neighbor, testified that he had no doubt when he identified defendant from a photo array as the shooter. Second, Robinson, who knew defendant from school, saw defendant, dressed in a black hoodie and cargo pants, reach into his pants pocket. However, Robinson did not actually see the gun because he (Robinson) took off running, immediately before the shots were fired. Singletary, who did not know defendant prior to the shooting, told police that he was only "40 percent sure" defendant was the shooter. Like Robinson, Singletary observed the shooter dressed in a black hoodie and cargo pants but did not see the gun itself because he also took off running. Of the three identifying witnesses, only Berquist observed defendant raise his arm and start shooting, but Berquist saw only a part of defendant's face as defendant fired.

¶ 28    Matthew Berquist, age 33 at the time of trial, testified that he was a jewelry artist and antiques dealer, residing with his girlfriend, Jodie Ricther, at their home on Ashland Avenue in Evanston. At the time of the shooting, Richter had lived in the home for 15 years, and Berquist had lived there for 2 years. Defendant's family, the Woodsons, lived in the house just to the south, and there was yet another house south of the Woodsons, located at the corner of Church Street and Ashland Avenue.

¶ 29    Photos of the area, which were admitted into evidence, showed that the Woodsons' garage is behind their house and at the back of their property. A part of the upper portion of their house is built over the cement driveway, such that the driveway goes from the street, under a part of the house, through the backyard, and to the garage. The cement area between the house and the garage widens into a patio area. The driveway is on the southern side of the

11

property, and, on the northern side, there is a storage area between the house and a fence. The fence separates the Woodson home from the Berquist home.

¶ 30    Berquist testified that, at approximately 10:15 p.m. on September 22, 2012, Berquist was outside, on the middle deck in his backyard, having a cigarette, when he heard what "sounded like maybe a football game and then some firecrackers," coming from the northwest. The deck in his backyard has three levels: the first one, closest to the house, is 4 feet off the ground; the middle one is two feet off the ground; and the third level is the lowest. There are lights above his kitchen door leading to the deck, above his side door facing south, and above the Woodsons' back door. After hearing the firecrackers, he heard the service door on the Woodson's garage being opened from the inside and observed defendant exiting with another man. Berquist heard a female voice coming from the house, saying to come over here. Defendant and the other man started walking toward the back door of the house, but then defendant turned and walked toward the fence that separates the Woodsons' property from Berquist's home. When defendant reached the fence, he ducked down out of view for 15 or 20 seconds. Defendant was near the storage area in the Woodsons' backyard, between the house and the fence. Both defendant and the other man then walked toward the back door; and the other man entered. However, defendant approached the fence a second time, ducked out of view again for 15 or 20 seconds, and then entered through the back door.

¶ 31    Berquist testified that he heard the front door open and then car doors open and close. Berquist then got off his deck at the southern end and walked on the garden path, east, toward Ashland Avenue. An SUV backed out of the Woodsons' driveway, but Berquist did not recall in what direction it headed. As Berquist stood in his own driveway, he noticed someone jogging down the sidewalk, southbound, toward Church Street and Ashland Avenue, and he

12

heard that person say, "I'll kill you." When the person reached the corner, the person raised his right arm and fired five shots. As the person was shooting, Berquist could see the side of the person's face and recognized the shooter as defendant. After dropping down a little, Berquist ran back along the garden path and entered the back door of his home, into the kitchen. In the kitchen, his girlfriend, Jodie Richter asked if those were gun shots, and he said yes. While Richter called 911, Berquist lit another cigarette. After Richter called 911 and Berquist finished his cigarette, he went to the corner of Church Street and Ashland Avenue, where he observed police cars. On the ground, Berquist found shell casings. Then Berquist grabbed a flashlight from his home and returned to the corner where he found more shell casings. When he returned to his home for the flashlight, he noticed that the Woodsons' SUV was back in their driveway.

¶ 32 Berquist testified that he then "strobed" his flashlight to attract an officer. Berquist explained that he had a strobe setting on his flashlight which flashes in rapid succession. After an officer responded, Berquist told him about the shell casings. The next day, Berquist returned to the corner to look for another shell casing because he had found only four casings the night before and he had heard five shots. The next day, he found the fifth casing. After finding it, he hailed an officer who was nearby and pointed out the fifth casing.

¶ 33 Berquist testified that, on the night of the shooting, he spoke with a Detective Otis Velma at Berquist's home. Berquist told the detective what he had observed but he did not identify the shooter. When asked to explain why he failed to identify the shooter at that time, Berquist stated, "He was my next-door neighbor. I didn't want to believe that he could do something like that and I was afraid." In the early morning after the shooting, at 2:45 a.m., Officers Musolf and Connelly interviewed him regarding his observations, and Berquist did

not identify the shooter to them either. On September 24, 2012, at the Evanston Police Department, Officers Bush and Connolly asked Berquist to look at a set of photos. Berquist identified defendant for the first time, from the photos. Prior to viewing the photos, Berquist asked the officers to show him "[s]ide face" photos because that is the view that he had had of the shooter. Berquist testified that, when he identified defendant from the photo array as the shooter, Berquist had no doubt. On September 26, 2012, Berquist also picked defendant out of an in-person lineup conducted at the Wilmette Police Department. During the lineup, Berquist asked the police to ask the men in the lineup to turn. When asked if he had any doubt when he identified defendant from the lineup as the shooter. He replied, "None."

¶ 34      On cross, Berquist testified that it was "[n]ot too dark." Berquist explained that there were streetlamps and that the actual scene was lighter than the photographs that he had been shown. While neither bushes nor a fence blocked Berquist's view of the shooter, a tree prevented him from having an unobstructed view of the shooter. Berquist observed a side angle of the shooter for a few seconds. After the shooting, Berquist did not hear anyone running back toward the Woodson home and did not hear or observe anyone enter the Woodson home. Berquist also did not see a car speeding down the street by him. When Berquist returned to his home after the shooting, he did not tell his girlfriend that he had just seen their next-door neighbor shoot somebody. Berquist testified that he was able to see the gun. However, Berquist did not tell the first police officer, whom he saw on the scene, that he had seen the gun. Berquist also did not tell the second police officer who interviewed him that night or the officers who came to his house early in the morning that he had seen the gun. Berquist did not tell the officers on either September 24, 2012, or September 26, 2012, that he had seen the gun. However, Berquist knew immediately that defendant was the shooter. On redirect, he corrected

himself and testified that he believed that he did tell the officers who came to his house in the early morning that he had seen the shooter holding the gun in his right hand.

¶ 35        Berquist testified that he told Detective Velma that, while sitting on his deck, he heard three gunshots that he thought were fireworks and that, a short time later, he heard some people talking in front of his house. Berquist told Velma that he had observed a black man, between 18 and 30 years old, between 5 foot 8 inches and 6 foot 2 inches, and between 160 to 200 pounds, jogging southbound on Ashland Avenue. Berquist believed that he told the police that the Woodson vehicle passed the shooter before the shooter reached the corner of Church Street and Ashland Avenue. On redirect, Berquist testified that he (Berquist) was 6 feet 2 inches tall.

¶ 36        Jodie Richter, Berquist's girlfriend, testified that, at about 10:35 p.m. on September 22, 2012, she was at home when she heard gunshots. Berquist entered through their back door, and he appeared "shocked." His movements were "jerky." Richter called 911 to report shots fired, and she called a second time after speaking to Berquist. Richter noticed that all the lights were off in the whole Woodson house, which she thought was unusual.

¶ 37        Carl Singletary, Jr., one of the three identifying witnesses, testified that, on the day of the offense, he was 16 years old, a junior at ETHS, and not a gang member. On September 22, 2012, at 9 p.m. he was at a party at a house on Emerson Street and Dewey Avenue, where he stayed for a half hour. Then he and some others left and walked to another party at a house on Church Street and McDaniel Avenue, located 3 blocks west of the high school. After arriving at close to 10 p.m., Singletary noticed Tyrone Usher, who was with the D Block gang. Singletary waited a bit before leaving because he knew "something was brewing" among the three gangs in the area—namely, the ABMs, D Block, and the Ls. After Singletary left the

party, he walked down Church Street with a group of seven other kids, or eight total. They figured they would walk to a certain point and then walk to their respective homes.

¶ 38    Singletary testified that they walked east on Church Street, past ETHS, and then turned left on to Dodge Avenue. As they walked north on Dodge Avenue, they heard a couple of gunshots coming from the north or ahead of them, from near Dodge Avenue and Lyons Street. They ran south and turned east on to Church Street. They started to slow down after running a couple of blocks on Church Street. As they walked east, toward Church Street and Ashland Avenue, they were talking about what had just happened. They were on the south side of the street, when they heard a loud voice coming from a man in the street. The man was in a black hoodie and cargo pants. He said, "which one of you," either bitches or mother f***. Singletary took "a quick glance" at the man. When the man reached toward his cargo-pants pocket, Singletary thought the man had a gun, so Singletary ran and did not look back. Singletary heard five shots whizzing past. There were pauses in between the shots, "like he was aiming." Singletary heard someone else say that Coleman, the murder victim, was down.

¶ 39    Singletary testified that, on that same night, some police officers took him to the ETHS football field to view a suspect, but Singletary said that the suspect, who he recognized as Usher, was not the shooter. Later that night, at the police station, Singletary provided a description of the shooter as having lighter skin, a short and skinny frame, and a pointy hairline. Singletary looked at some photos and identified defendant as the shooter, saying that he (Singletary) was "40 percent sure." On September 25, 2012, Singletary viewed a lineup from which he identified defendant. Prior to making an identification, he asked the police to ask the men in the lineup to say, "which one of you little bitches." Defendant "sounded like the person," but defendant's voice was a little higher pitched than the shooter's voice had been.

16

Singletary told the police that defendant was the one who sounded most like the shooter. During Singletary's testimony, the State played the video from an ETHS security camera, which showed the eight-person group, including Singletary, as it walked past ETHS. The parties stipulated that the video contained "the true and accurate video images captured from" the ETHS security camera located on the "corner of Church and Dodge the night of September 22nd, 2012." Singletary testified that, at the point on the tape marked 10:30 p.m., the tape showed "us eight" as they crossed Dodge. At 10:31 p.m., his group was out of sight of the camera, but he testified that this was when they heard gunshots coming from the north, and they ran back.

¶ 40    On cross, Singletary testified that it was dark out, but that there was a streetlight at the corner of Church Street and Ashland Avenue, although not on the corner that the shooter came from. Singletary observed the shooter for "a little bit more" than one to two seconds. When Singletary spoke to the police that night, he said one to two seconds, but that was a rough estimate. Singletary had never seen the shooter before that night, and the shooter had a hood on. However, Singletary clarified that "the hoodie wasn't fully on his head all the way," so that Singletary could observe some of the shooter's hairline. From his observation of the shooter's hairline, Singletary told the detective that the shooter's hair was very short. However, Singletary did not know if the shooter had long hair in the back. When the shooter reached for his pocket, he was wearing a black hoodie and cargo pants.

¶ 41    Singletary testified that, from the time that shots were fired at Dodge Avenue and Lyons Street until shots were fired at Church Street and Ashland Avenue was less than 10 minutes. Singletary estimated that it took two to four minutes to run away from the first shots to Mason Park on Church Street and then took roughly five minutes to walk from Mason Park on Church

17

Street to Church Street and Ashland Avenue, for an estimated elapsed time of between seven to nine minutes between the two sets of shots. After viewing a six-person photo array, Singletary testified that, when he identified defendant, the photo "mostly resembled" the shooter. On redirect, he testified that he told the police that he had seen the shooter pull something out of his pocket and that, during the lineup, he told them that the person he picked had the same complexion, hairstyle, and height as the shooter.

¶ 42 Like Singletary, Robinson identified defendant as the shooter after having observed the shooter just before Robinson took off running. However, unlike Singletary, Robinson knew defendant prior to the shooting. Robinson testified that in September 2012, after having graduated ETHS, he was attending Oakton Community College and managing the ETHS varsity basketball team. On September 22, 2012, at 9 p.m., he was at the same party on Emerson Street, which Singletary attended. At 10 p.m., Robinson went to a second party, at Church Street and McDaniel Avenue, where he noticed Usher, who Robinson knew to be a member of the D Block gang. When Robinson left the party to head home, he was walking with a group of eight people that included himself, Singletary, and the murder victim. They walked east on Church Street and turned north on to Dodge Avenue, heading toward Lyons Street. After hearing shots coming from Lyons Street, they ran in the opposite direction, running south and then turning east on to Church Street. When they reached Mason Park, they slowed down and were walking and talking, as they headed east on Church Street toward Ashland Avenue. Robinson was in the middle of the group at this point, when he noticed someone walking around the corner at Ashland Avenue, who then said, "which one of you little" and another word. This person, whom Robinson identified in court as defendant, stood in the middle of the street, on Ashland Avenue. Robinson recognized defendant, as defendant

was standing in the middle of the street. Robinson knew defendant through defendant's sisters, who Robinson had gone to school with. After defendant made the "which one" statement, defendant reached for his pants pocket, which was on the right side of his cargo pants. In addition to the cargo pants, defendant was wearing a black hoodie. When defendant reached for his pocket, Robinson ran back toward Mason Park. Robinson observed defendant for about seven seconds before Robinson turned to run.

¶ 43    Robinson testified that, after the shooting, he went to a police station, where a detective asked him if he had seen the shooter's face. Robinson said that he did not know who it was. Robinson did not identify the shooter because he "was just in shock" and shaken up. Robinson did provide a general description that the shooter was male, black, light-skinned, in all-black clothes, and 18 or 19 years old. The detective asked if he would look at some photos. He said yes, but he was so shaken up that he just went home with his stepfather. The following Tuesday, two detectives came to speak to him at ETHS and asked if he was willing to look at photos or a lineup. He said yes. The officers did not ask Robinson at that time if he knew who the shooter was, and Robinson did not volunteer that information. The next day, September 26, 2012, Robinson went to the Wilmette police station and viewed a lineup from which he identified defendant.

¶ 44    On cross, Robinson testified that, on the night of the shooting, he told the police that he had not seen the shooter's face. The next day, Robinson told the police that the shooter was wearing dark-colored sweatpants. On the night of the shooting, Robinson first observed defendant as defendant walked to the street from Ashland Avenue. At first on cross, Robinson testified that he could not recall whether the hood on defendant's hoodie was up; but later, on cross, he testified that the hood "was not on." Robinson recalled hearing three shots, not five.

Of the five people in the lineup, Robinson knew another person in the lineup from high school. Robinson testified that there were streetlights on both sides of the street. On redirect, referring to photos, Robinson testified that there was a streetlight on the same side of the street that defendant was on, which was the north side of Church Street, and that there was another streetlight on the south side of Church Street. In addition, there were other streetlights on, as the group had walked down Church Street.

¶ 45        In addition to identification witnesses, the State called a gang expert to try to establish a motive. Sergeant Michael Endre testified that he had been with the Evanston Police Department for 13 years, including five years on the "Neighborhood Enforcement Team" (NET), which is a gang and narcotics unit. At that time, he became in charge of "the gang files," where the police keep track of gang activities and members. After serving as a NET officer, he became an intelligence officer, whose primary responsibility was to put together a weekly deployment meeting, where information from the prior week was analyzed in order to plan how to best utilize resources for the upcoming week. Although he became an intelligence officer, he maintained his responsibilities for the gang files. In March 2017, which was the year of the trial, Endre was promoted to sergeant, supervising officers in the patrol division. The court ruled that Endre was allowed to testify as an expert in gang crimes.

¶ 46        Endre testified that, in 2012, there were neighborhood-based gangs in Evanston, the largest of which was, and is, the D Block gang. In 2012, D Block's primary area of control included the area north of Church Street and Dodge Avenue, toward Lyons Street. Other neighborhood gangs included O Block and ABM-TTG, which was a hybrid gang made up of two gangs. The average age of D Block was 20 years old, of O Block was 24, and ABM-TTG was 16. Endre testified that, in his opinion, "to a reasonable degree of certainty," that in 2012

defendant belonged to the D Block gang, His opinion was based on a number of factors, including a review of the Evanston gang files, defendant's social media, defendant's gang tattoos, and interviews with defendant's family and friends. Text messages on defendant's phone, which Endre reviewed, discussed "access to firearms."

¶ 47    While defendant had a continuing objection at trial to all of Endre's testimony, the parties agreed to the court's reading to the jury a limiting instruction. The instruction concerned evidence that defendant was involved in conduct other than that charged in the indictment. The instruction stated, among other things, that this evidence was being "received on the issue of the defendant's motive and intent and may be considered by you only for that limited purpose."

¶ 48    Endre's testimony continued after the limiting instruction was read, and he testified that, based on his expert opinion, Usher was also, and is still, a member of the D Block gang. However, the group of eight, who were the victims of this offense, were not members of any gang. In 2012, the D Block gang was in conflict with both the O Block gang and the ABM-TTG gang, as well as in a minor conflict with the LOC City Gangster Disciples from another district. The conflict started on April 22, 2012, with a gang-related shooting over a dice game in D Block territory, in which defendant and another D Block member were shot. Bryan Miller, an O Block member, shot defendant in the lower back and shot Dajuan Blackwell in the thigh. However, the shooter was not charged because the victims refused to cooperate.

¶ 49    Endre testified that the dice game was "a major catalyst for violence that continued all summer long, including this homicide." There was a period in early May that was particularly violent, as well as "much of the month of September leading up to [the] murder" in this case. On May 10, 2012, a D Block member was located with lacerations to his head, and the victim identified ABM gang members as the offenders who had beaten him with a golf club and a

brick. However, the victim did not cooperate with the police. There were further altercations later that same evening, with more than 25 people in the street and at least one person taken to the hospital. One group, including one person with a sledgehammer, chased an ABM member. One incident involved a fight with metal poles, rocks, and bottles, and both D Block members and ABM members were present. On May 12, officers responded to another large group fight.

¶ 50    Endre testified that, on May 13, 2012, an O Block member was taken to St. Francis Hospital[5] with a gunshot wound in the back. However, the victim and his family refused to cooperate with police. On May 28, 2012, a D Block member was observed holding a baseball bat and yelling at a group on Dodge Avenue, near Church Street. On July 13, 2012, the police received a report of 10 people fighting in the street, near Dodge Avenue and Lyons Street. Also, on July 13, on Emerson Street, a person riding his bike fired multiple shots in the air. On July 14, 2012, two ABM members were stabbed in downtown Evanston, during a fight involving D Block members. A D Block member was found with a knife, but the victims did not cooperate with police.

¶ 51    Endre testified that, on July 15, 2012, a confidential informant told the police that the reasons for the violence were, first, that O Block members were trying to recruit younger ABM members to join O Block's opposition to D Block and, second, that defendant and the other victim of the dice game shooting were believed to be cooperating with police. On September 8, 2012, shots were fired shortly after midnight near Dodge Avenue and Lyons Street.[6] An anonymous texted tip stated that the shooter was the same person who had shot at defendant

_____

[5]Although not stated, St. Francis Hospital is located in Evanston.
[6]Dodge Avenue and Lyons Street was the location where the first shots were fired on the night of September 22, 2012, which caused the group of eight to run back toward Church Street.

22

on April 22, 2012, and that shots were fired at other D Block members. On September 13, 2012, the shooter was arrested in Chicago for unlawful use of a weapon.

¶ 52     Endre testified that, on September 15, 2012, the police went to Lyons Street and Darrow Avenue, which is also close to Dodge Avenue, where they found a shooting victim, who was the brother of Dajuan Blackwell, the person who had been shot along with defendant on April 22, 2012. The September 15, 2012, victim, Donte Blackwell, stated that, immediately before he was shot, the shooter accused him of cooperating with police. Endre reviewed photos taken on the night of September 15, 2012, that showed D Block members, including defendant, on the back porch of the Blackwell residence holding firearms.[7] On September 20, 2012, a masked gunman fired multiple rounds at the sliding glass door of the Blackwell home.

¶ 53     Endre testified that defendant was not named as an offender in any of the incidents between April 22, 2012, and September 20, 2012, which Endre had just described. The trial court sustained an objection to a question about whether defendant was knowledgeable about the conflict occurring during this period. Endre testified that he reviewed a report of the download of defendant's cellphone that included photos and text messages. The photos established that defendant was associated with members of D Block between April and September 2012. In addition, defendant's phone contained numerous text messages between April and September 2012, about the ongoing conflict and about firearms. In the photo taken the night of September 15, 2012, of defendant and others on the Blackwell porch, defendant was wearing a custom sweatshirt that had gang symbols and that stated: "N*** say they drill, they need practice, homie." Endre explained that "drill" was "slang for shooting a gun." A photo with defendant wearing this sweatshirt was seen on defendant's Facebook page, just

---

[7]Endre later testified that this photo was obtained from a download of defendant's cell phone.

days prior to the shooting. Endre explained that he found the wording of the shirt significant because there is usually an uptick of antagonizing posts after major incidents.

¶ 54    Endre testified that he reviewed an interview of defendant by police on September 26, 2022, four days after the shooting at bar. During the interview, defendant stated that ABM and TTG members at one of the parties on September 22, 2012, had guns. The State introduced a number of exhibits that included photos from September 2012 of defendant making D Block hand signs and of defendant with other D Block members, including Tyrone Usher. Also admitted were photos of defendant's gang tattoos and photos from his Facebook page and Usher's Facebook page. Endre also identified phone calls on a log of calls made from Usher's phone on September 22, 2012, the night of the offense. Among the numerous calls, the log indicated that Usher received a call from defendant at 7:58 p.m. and that Usher called defendant at 10:27 p.m. Usher then called defendant's sister, Tiffany, at 10:31 p.m.[8] Endre testified that the shooting occurred at approximately 10:34 p.m. Usher called 911 at 10:29 p.m. and again at 10:36 p.m. Defendant's sister, Victoria, called Usher at 10:44 p.m. and again at 10:47 p.m. Usher called Victoria three times, and she called him at 10:50 p.m.

¶ 55    On cross, Endre testified again that, with respect to the gang-related incidents between April and September 2012, about which Endre had just testified on direct examination, defendant was not involved in any of them, except for the fact that defendant was shot on April 22, 2012, with Dejuan Blackwell. The State called other law enforcement personnel to testify about other aspects of this investigation, and then the defense elected to put on a case.

¶ 56    The witnesses called by the defendant included Michele Woolridge, who testified that, at the time of the shooting, she lived on Ashland Avenue, across the street from the Woodson

---

[8]Tiffany had testified that the call from Usher was at 10:32 p.m.

home. Woolridge explained that there was another home straight across the street from her home and that the Woodson home was next to that one. After she heard three or four gunshots at about 10:30 p.m. on September 22, 2012, she went out on her front porch to look for her son. While on the porch, she scanned the street to see where he was, and she called him on her cell phone to tell him to come home now. At that time, she did not see defendant on the street and did not see anybody run into the Woodson home. She did see a black car "flying with its lights off," traveling north on Ashland Avenue. Woolridge could not say whether the car was fleeing from the gunshots.

¶ 57          Amy Gabbert testified that she lived on the corner of Church Street and Ashland Avenue, in the house just south of the Woodsons. Unlike the Woodson home which fronted on Ashland, her home fronted on Church Street. Gabbert testified that there was no streetlight on her corner and that "[i]t's dark." The perimeter of her house had bushes that were five or six feet tall, with a walkway through them, to Church Street. The area east of her home, toward Ashland Avenue, was an open lawn. One could walk up the walkway from Church Street and across the lawn. Once in this open area, which was to the east of her house, one could jump over a small waist-high fence to enter the Woodson driveway, since there was a break in the bushes by the driveway.

¶ 58          Gabbert testified that, after hearing gunshots at about 10:30 p.m. on September 22, 2012, she crawled to her children's bedroom to keep below the window line and to make sure they were asleep. After reaching their room, she "just stood there for a little while." Next, she went to her office and looked out her office window, where she saw defendant smoking a cigarette in his backyard. Gabbert heard defendant yell something, as he was looking east toward Ashland Avenue, and then he walked toward the garage. When asked if he was

wearing a hooded sweatshirt, she replied, "No clue. I mean, I feel like I saw his face, so if I saw his face he didn't have a hood on." When asked how long defendant was out there, she replied, "I have no idea; a couple minutes." After hearing the shots, she did not hear anyone running back through the Woodsons' garage. Gabbert testified that, as she sat at trial, she could not recall how much time elapsed between hearing the shots and observing defendant in his backyard. However, when she spoke to an Evanston detective on April 4, 2017, she recalled telling him that it was "approximately 5, 10 minutes."

¶ 59        Defendant also called several law enforcement witnesses, regarding statements that they obtained from identification witnesses Singletary, Robinson, and Berquist. Detective David Cepiel testified that on September 22, 2012, Singletary told him that, prior to the shooting, the shooter stated something to the effect of "you motherf*** were shooting out there." Singletary also stated that he saw the shooter for one or two seconds and that he heard three or four shots. Detective Troy Musolf testified that, on September 25, 2022, he spoke with Robinson, but Musolf did not recall asking Robinson whether he knew the shooter or whether he could identify the shooter. Robinson did indicate that he was willing to view a lineup. Detective Velma testified that, on September 22, 2012, at 11:30 p.m., he spoke with Berquist, but he did not recall asking Berquist if he saw the shooter or knew the shooter. Velma recalled that Berquist appeared nervous. Sergeant John Connolly testified that he spoke with Berquist on both September 23 and 24, 2012. On September 24, 2012, Berquist stated that a "GMC" drove past the shooter seconds before the shooting. Berquist also stated that, while the shooter was standing on Church Street, the porch lights from a nearby home illuminated the shooter's face, while a tree in the Woodson's front yard kept the glare out of his eyes.

¶ 60    Defendant's father testified that he knew his son was in the D Block gang, but after defendant was shot in April 2012, defendant became "low key" and hung out with his girlfriend, "and that was it." Defendant's father thought his son had stopped his gang involvement after being shot. Defendant's father did not testify about hearing or seeing the shooter; rather, he, his wife, and his daughter, Victoria, departed their home at about 10:30 p.m., which was prior to the shooting, to go pick up his wife's cousin, Usher. When his wife came outside to tell him they had to go pick up Usher, he went back in the house and saw defendant in the house. Once in the car, his wife, who was driving, pulled their GMC Acadia out of their driveway and headed south to Church Street and Ashland Avenue. At that time, he did not see anyone jogging past their vehicle and did not see his son outside. Defendant's father also testified that there was one streetlight at the corner that had been out for a long time, and so it was dark at night.

¶ 61    After listening to closing arguments and jury instructions, the jury deliberated and found defendant guilty of first degree murder and multiple counts of attempted murder. It found that defendant had personally discharged a firearm with respect to each count. At sentencing, the trial court sentenced defendant to a total of 71 years, which was the minimum possible sentence. Defendant filed a timely notice of appeal, and this appeal followed.

¶ 62                                II. ANALYSIS

¶ 63                          A. Sufficiency of the Evidence

¶ 64    Defendant's first claim is that the State failed to prove beyond a reasonable doubt that he was the shooter, where the principal evidence connecting him to the shooting were the three identifications and all three were unreliable because the witnesses saw the shooter at night, on an allegedly poorly lit street, for only a few seconds.

¶ 65    All the sufficiency issues raised by defendant on this appeal, such as the witnesses' brief time to view and the allegedly insufficient lighting, were raised by counsel "during trial and argued to the jury who simply did not find them persuasive." *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 39 ("the sufficiency issues were raised by [defendant's] counsel during trial and argued to the jury who simply did not find them persuasive"); *People v. Joiner*, 2018 IL App (1st) 150343, ¶ 63 ("[d]efendant's argument regarding the sufficiency of the evidence fails because the weaknesses in the evidence that defendant cites on appeal were all presented to, considered, and rejected" by the factfinder). Below, we address each of the factors that may affect identifications and explain why we also do not find this claim persuasive.

¶ 66                                    1. Standard of Review

¶ 67    When a defendant challenges the sufficiency of the evidence at trial, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Aljohani*, 2022 IL 127037, ¶ 66. It is the factfinder's responsibility to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences. *Aljohani*, 2022 IL 127037, ¶ 66. In particular, "[i]t is the responsibility of the fact finder, not the reviewing court, to determine the credibility of witnesses." *People v. Teague*, 2013 IL App (1st) 110349, ¶ 26 (citing *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009)).

¶ 68    When reviewing a sufficiency challenge, we will not retry the defendant or substitute our own judgment for the trier of fact. *Aljohani*, 2022 IL 127037, ¶ 67. All reasonable inferences are drawn in favor of finding a guilty verdict. *Aljohani*, 2022 IL 127037, ¶ 67.

¶ 69                                    2. Identification Evidence

¶ 70          As noted, on this appeal, defendant challenges the State's identification evidence. Although identification evidence that is vague or doubtful is insufficient to support a conviction, a single witness's identification of the accused is sufficient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. *Thompson*, 2020 IL App (1st) 171265, ¶ 42; *Joiner*, 2018 IL App (1st) 150343, ¶ 47.

¶ 71          In assessing the reliability of identification testimony, courts generally consider the five factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972): (1) the witness's opportunity to view the offender during the offense, (2) the witness's degree of attention at the time of the offense, (3) the witness's prior description of the offender, (4) the witness's level of certainty at the identification, and (5) the length of time between the offense and the identification. *Thompson*, 2020 IL App (1st) 171265, ¶ 42; *Joiner*, 2018 IL App (1st) 150343, ¶ 47.

¶ 72                                    3. Opportunity to View

¶ 73          With respect to the first factor—opportunity to view—defendant argues that the brief time of the initial viewing casts doubt on all three identifications. All three witnesses viewed the shooter for only seconds before turning and running themselves. Robinson, for example, testified that he saw the shooter for about seven seconds before turning and running. Singletary likewise ran, and Berquist testified that he ducked down and then ran back along the garden path to his back door. However, "[t]he brevity of a witness's opportunity to view, by itself, will not discredit an identification, although it is a factor that a trier of fact may consider when weighing the testimony." *Thompson*, 2020 IL App (1st) 171265, ¶ 45 (evidence was not insufficient, although one witness saw one of the shooters for 5 to 10 seconds and another witness observed him for less than 5 seconds); *People v. Petermon*, 2014 Il App (1st) 113536,

¶ 32 (identification was found to be reliable, although "the entire incident took less than a minute").

¶ 74 Also, with respect to the first factor, defendant argues that the lighting conditions were poor. However, what the exact lighting conditions were and whether there was, or was not, sufficient lighting in the area was a subject of dispute between State and defense witnesses at trial.

¶ 75 The three identifying witnesses all indicated that there was sufficient lighting for them to make an identification. On cross, Berquist testified that it was "[n]ot too dark." Berquist explained that there were streetlamps, and that the actual scene was lighter than the photographs that he had been shown at trial. On cross, Singletary testified that it was dark out, but that there was a streetlight at the corner of Church Street and Ashland Avenue, although not on the corner that the shooter came from. On cross, Robinson testified that there were streetlights on both sides of the street. On redirect, referring to photos, Robinson testified that there was a streetlight on the same side of the street that defendant was on, which was the north side of Church Street, and that there was another streetlight on the south side of Church Street. Robinson also testified that there were other streetlights on, as the group had walked down Church Street.

¶ 76 In contrast to the State witnesses, defense witnesses Amy Gabbert and defendant's father both testified that it was dark and that there was no working streetlight on the corner of Church Street and Ashland Avenue. Specifically, defendant's father testified that there was one streetlight at the corner that had been out for a long time; as a result, it was dark there at night. Similarly, Gabbert testified that there was no streetlight on her corner and "[i]t's dark."

This dispute between the State and defense witnesses about the sufficiency of the lighting in the area was a credibility dispute that was up to the jury to resolve.

¶ 77    In resolving this dispute, the jury could consider that both defendant's father and Gabbert testified about what they had observed that night, although they were not speaking specifically of the Ashland/Church corner. Defendant's father testified that he did not see his son outside as their vehicle drove down Ashland to the corner of Church Street,[9] and Gabbert testified that she looked out her office window and observed defendant in the backyard smoking a cigarette.

¶ 78    Also, as part of the first factor, defendant argues that Robinson and Singletary did not see the gun because they turned and ran as the shooting began. Robinson testified that he noticed someone walking around the corner at Ashland Avenue, who then said, "which one of you little" and another word. This person, whom Robinson identified in court as defendant, stood in the middle of the street, on Ashland Avenue. Robinson recognized defendant, as defendant stood in the middle of the street. Robinson knew defendant through defendant's sisters, who Robinson had gone to school with. After defendant made the "which one" statement, defendant reached for his pants pocket, which was on the right side of his cargo pants. It was up to the jury whether to draw the inference that what defendant reached for was a gun, when shots followed almost immediately after. We cannot say that such an inference is unreasonable or irrational. *Aljohani*, 2022 IL 127037, ¶ 67.

¶ 79    Like Robinson, Singletary did not see the actual gun because he ran. Singletary testified that the group of eight were on the south side of Church Street, when they heard a loud voice

---

[9]In contrast, Berquist told the police that the Woodson vehicle passed defendant before defendant reached the corner of Church Street and Ashland Avenue.

coming from a man in the street. The man was in a black hoodie and cargo pants, and he said, "which one of you," either bitches or mother f***. Singletary took "a quick glance" at the man, but when the man reached for his cargo-pants pocket, Singletary thought the man had a gun, so Singletary ran. Singletary did not look back, as five shots whizzed past him. As with Robinson, it was up to the jury whether to draw the inference that the pocket contained a gun but, in light of the immediate shots, we cannot find this inference unreasonable.

¶ 80       With respect to the first factor, defendant argues that Berquist was more than 30 feet away from the shooter when Berquist recognized defendant. However, at trial, Berquist was not asked to estimate how many feet away he was from the shooter when he recognized him.

¶ 81       Defendant argues that Berquist saw only a part of the shooter's face. At trial, Berquist testified that, as he stood in his own driveway, he noticed someone jogging down the sidewalk, southbound, toward Church Street and Ashland Avenue, and he heard that person say, "I'll kill you." When the person reached the corner, the person raised his right arm and fired five shots. As the person was shooting, Berquist could see the side of the person's face and recognized the shooter as defendant. As the defense acknowledges, defendant was someone Berquist knew and had just seen that day. A rational juror could have reasonably found that a witness could recognize someone he knew well from seeing one side of the person's face. For example, most of us have no trouble recognizing Lincoln's side view on a penny or Washington's side view on a quarter.

¶ 82       Viewing the evidence in the light most favorable to the prosecution as we must, we cannot find that defendant's arguments on this factor cause us to believe that no rational trier of fact could have found defendant guilty. *Aljohani*, 2022 IL 127037, ¶ 66.

¶ 83                                4. Degree of Attention

¶ 84           With respect to the second factor, the witnesses' degree of attention, defendant argues that their degree of attention was compromised by the level of stress that the shooting itself created. However, all three witnesses testified that they were basing their identifications on their views of the shooter prior to shots being fired. In *Thompson*, 2020 IL App (1st) 171265, ¶ 43, this court rejected this same argument for the exact same reason. We stated: "The problem with this argument is that both [witnesses] observed [the defendant] *before* the shooting even started." (Emphasis in original.) *Thompson*, 2020 IL App (1st) 171265, ¶ 43. As in *Thompson*, all three witnesses in the case at bar testified that, although for a brief time, their attention was "focused on" the shooter. *Thompson*, 2020 IL App (1st) 171265, ¶ 46.

¶ 85                         5. Prior Descriptions and Timely Identification

¶ 86           The third and fifth *Biggers* factors are the accuracy of the witness's prior descriptions of the offender and the length of time between the offense and the witness's identification. *Biggers*, 409 U.S. at 199-200; see *Thompson*, 2020 IL App (1st) 171265, ¶ 42; *Joiner*, 2018 IL App (1st) 150343, ¶ 47.

¶ 87           In the case at bar, the two witnesses who knew defendant previously, both Berquist and Robinson, failed to immediately inform the police that defendant was the shooter. However, they explained the reasons for their reluctance. Berquist did not want to "out" his neighbor, and both felt shaken up immediately after the shooting. When Berquist was asked on direct examination to explain why he failed to identify the shooter on the night of the shooting, Berquist stated: "He was my next-door neighbor. I didn't want to believe that he could do something like that and I was afraid." Jodie Richter, Berquist's girlfriend, testified that, when Berquist entered through their back door shortly after the shooting, he appeared "shocked" and

his movements were "jerky." Robinson testified that he did not identify defendant as the shooter on the night of the shooting because he "was just in shock" and shaken up. Robinson did provide a general description that the shooter was male, black, light-skinned, in all-black clothes, and age 18 or 19 years old.

¶ 88 All three identifications, however, came shortly after the shooting and within days of the offense. Singletary identified defendant that same night. He testified that, on the same night of the shooting, some police officers took him to the ETHS football field to view a suspect, but Singletary said that the suspect, who he recognized as Usher, was not the shooter. Later that night, at the police station, Singletary provided a description of the shooter as having lighter skin, a short and skinny frame, and a pointy hairline. Singletary looked at some photos and identified defendant as the shooter, saying that he (Singletary) was "40 percent sure." As for the others, Berquist identified defendant on September 24, 2012, just two days after the shooting, and Robinson identified defendant on September 26, 2012, only four days after the shooting. *Thompson*, 2020 IL App (1st) 171265, ¶ 46 (finding an identification reliable that was "a little over two months after" the offense); *People v. Green*, 2017 IL App (1st) 152513, ¶ 113 (finding an identification with a three-month time lapse reliable); *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 22 (affirming the defendant's conviction where the witness made an identification within three months after the crime); *People v. Malone*, 2012 IL App (1st) 110517, ¶ 36 (rejecting defendant's argument that a time lapse of one year and four months was " 'a seriously negative factor' "); see *People v. Rodgers*, 53 Ill. 2d 207, 213-14 (1972) (affirming the defendant's conviction where the witness made an identification two years after the crime).

¶ 89    We cannot find that these two factors, when viewed in the light most favorable to the State, are so unreasonable or unsatisfactory as to find that no rational juror could have found defendant guilty beyond a reasonable doubt. *Green*, 2017 IL App (1st) 152513, ¶ 114.

¶ 90                                        6. Certainty

¶ 91    The remaining *Biggers* factor is the witness's level of certainty at the identification. *Biggers*, 409 U.S. at 199-200; *Thompson*, 2020 IL App (1st) 171265, ¶ 42; *Joiner*, 2018 IL App (1st) 150343, ¶ 47.

¶ 92    In the case at bar, Berquist testified that he had no doubt when he identified defendant as the shooter to police. In contrast, Singletary testified that he was 40% certain. Robinson testified that he recognized defendant, as defendant was standing in the middle of the street prior to the shooting. Robinson explained that he knew defendant through defendant's sisters, who Robinson had gone to school with.

¶ 93    With respect to Berquist, defendant argues that we should give this factor little weight because there is a low correlation between a witness's level of certainty and whether the identification is correct. However, with respect to Singletary, defendant argues that Singletary's identification is worthless because of his low level of certainty. Obviously, both assertions cannot be true, and the truth probably lies somewhere in the middle.

¶ 94    On the one hand, Berquist's statement may not be as absolutely certain as his words convey, but it does not have to be. Our system does not require "no doubt" at all, as he testified to, but rather conviction beyond a *reasonable* doubt. Similarly, Singletary's lack of certainty does not render his statement worthless. Analogous thereto, if the forecast is for 40% chance of rain, it would not be unreasonable to still take an umbrella. Additionally, Singletary's

identification, even at 40%, still provides corroboration for the identifications by Berquist and Robinson, who both recognized defendant from their prior contact with him.

¶ 95 The difference in certainty expressed by Berquist and Singletary could be accounted for by their different levels of familiarity with the subject of the identification.[10] Berquist was familiar with defendant as his next-door neighbor, while Singletary did not know defendant before the shooting. The difference in familiarity was well-explained to the jury. Thus, we cannot find that a lack of certainty undercuts a jury verdict, based on three separate and independent identifications.

¶ 96 Together, these three separate identifications—along with the State's evidence of opportunity, proximity, and motive—make it impossible for us to find that no rational person could have convicted defendant.[11] Based on all this evidence, a rational person certainly could have found defendant guilty beyond a reasonable doubt. *Aljohani*, 2022 IL 127037, ¶ 66.

¶ 97 B. Gang Evidence

¶ 98 Defendant's second claim is that the State's introduction of gang evidence was excessive. On appeal, defendant does not dispute either that he was in a gang or that some evidence was relevant in order to show both that he was in a gang and that his gang was in a conflict with other gangs in Evanston at the time of the shooting. Instead, defendant's claim on appeal is that the State's gang evidence was excessive when it introduced more than a dozen gang-related crimes that defendant was not involved in. Specifically, defendant argues on

---

[10]Defendant argues that prior familiarity with a subject "actually works against the reliability of their identifications," and he cites one case in support: *United States v. Wade*, 388 U.S. 218 (1967). Specifically, defendant cites pages 228 and 229, where the court quoted Justice Frankfurter as stating: " 'The identification of strangers is proverbially untrustworthy.' " *Wade*, 388 U.S. at 228. The court then proceeds to explain why this is so. *Wade*, 388 U.S. at 228-29. This cite does not further defendant's argument.

[11]We discuss the evidence in more detail below where we consider whether a preserved error requires reversal. *Supra* ¶¶ 104-107.

appeal: "Since [defendant] was not involved in any of these other gang-related crimes, the above evidence was irrelevant and so prejudicial that it denied [defendant] his right to a fair trial."

¶ 99    In the court below, the prosecutor stated that, although the State had evidence of defendant's involvement in other crimes, it would not use that evidence to show the ongoing conflict, specifically in order to avoid introducing other-crimes evidence. At the pretrial hearing, the State argued that it had "taken great pains to reduce the prejudicial impact upon the defendant." The State noted that, although it had evidence of defendant's participation in other crimes, it was not seeking "to get into that prejudicial material." Instead, it was "limiting" its motion to "evidence that shows that the defendant was a D Block member, that his cousin, Tyrone Usher, was a D Block member, and the fact that D Block was in conflict with other gangs that summer, and that the defendant was knowledgeable about that." The State asserted that, since it would not introduce evidence of criminal activity by defendant, its motion was "not a proof of other crimes motion."

¶ 100    On appeal, defendant cites caselaw regarding other crimes or bad acts committed by a defendant. However, as he also argues on appeal, defendant "*was not involved in a single one of these other gang crimes.*" (Emphasis in original.) Defendant also cites caselaw regarding evidence that reveals that a defendant is a gang member. However, he also argues on appeal that he never disputed that he was in a gang, and he concedes that the court did not err "in allowing the State to put on some evidence that [defendant] was in a gang[12] and that his gang was in conflict with other Evanston gangs in September 2012."

---

[12]In the first paragraph of defense counsel's closing argument to the jury, he stated: "Nobody is hiding the fact that [defendant] is a gang member."

¶ 101     The rule that applies when a court must evaluate when some evidence is too much and, hence, unfairly prejudicial is Illinois Rule of Evidence 403 (eff. Jan. 1, 2011). Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 403 (eff. Jan. 1, 2011). All evidence is prejudicial in the sense that it compels the factfinder in one direction or the other; the issue posed by Rule 403 is when it becomes "unfair[ly]" so. Ill. R. Evid. 403 (eff. Jan. 1, 2011); *People v. Gordon*, 2017 IL App (3d) 140770, ¶ 25 ("all evidence is prejudicial in that it is intended to impact the factfinder's decision. Why would anyone put on evidence at trial that did not prejudice the opponent's case?"). Evidence is unfairly prejudicial when it casts a negative light on a defendant for reasons that have little to do with the case on trial. *Gordon*, 2017 IL App (3d) 140770, ¶ 25. Defendant argues that this error was preserved for our review, and the State does not argue otherwise. *People v. Salamon*, 2022 IL 125722, ¶ 56 (to avoid a procedural default and preserve an error for later review, a criminal defendant must raise the issue at trial and in a posttrial motion).

¶ 102     The admission of evidence is generally within the sound discretion of the trial court, and we will not disturb a trial court's evidentiary rulings absent an abuse of discretion. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 12. An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *Colon*, 2018 IL App (1st) 160120, ¶ 12. Like other evidentiary rulings, evidentiary rulings regarding gang-related evidence are reviewed for an abuse of discretion. *Colon*, 2018 IL App (1st) 160120, ¶ 34. Although there is widespread disapproval of street gangs, a defendant may not insulate the factfinder from the fact of his gang membership, despite prejudice toward it, if that fact is relevant to understanding the case. *Colon*, 2018 IL

App (1st) 160120, ¶ 34. It is also well-established that "[o]ne of the purposes for which gang evidence is admissible is to 'provide a motive for an otherwise inexplicable act.' " *People v. Villareal*, 198 Ill. 2d 209, 233 (2001) (quoting *People v. Smith*, 141 Ill. 2d 40, 58 (1991) ("admissible *** to provide a motive for an otherwise inexplicable act")); see *Colon*, 2018 IL App (1st) 160120, ¶ 35.

¶ 103    Defendant argues that this evidence was "*totally irrelevant because* [defendant] *was not involved in a single one of them.*" (Emphasis in original.) Although defendant concedes on appeal that some evidence of the conflict in September 2012 was admissible, he argues that testimony about the April 22, 2012, dice game and shooting of defendant "would have been more than sufficient." The State agrees that the incident on April 22, 2012, was indeed the catalyst for the ensuing violence in the following months. Evidence that defendant himself had been a victim of a gangland shooting—plus evidence that defendant's cousin had been stabbed that same day, that defendant learned of this stabbing just minutes before the shooting, that there was no time at all for a cooling-off period before the shooting began, and that the shooter, who was identified by three people as defendant, approached the group demanding to know "which one of you" —was sufficient to establish motive and an explanation for an inexplicable act. A description of numerous other bad acts and gang events, which defendant was not a part of, was far more prejudicial than probative and simply not necessary to the case at bar. Thus, we find that the trial court abused its discretion in admitting this unrelated and prejudicial evidence.

¶ 104    Our supreme court has recognized three approaches for determining whether a preserved error requires reversal. *People v. King*, 2020 IL 123926, ¶ 40. Reversal is not required (1) if the error did not contribute to the defendant's conviction, (2) if the other

evidence was overwhelming, or (3) if the challenged evidence was duplicative or cumulative of other properly admitted evidence. *King*, 2020 IL 123926, ¶ 40; *People v. Lerma*, 2016 IL 118496, ¶ 33. In the case at bar, reversal is not required where the other evidence established defendant's guilt beyond any reasonable doubt. *People v. Tompkins*, 2023 IL 127805, ¶ 61; *People v. Effinger*, 2016 IL App (3d) 140203, ¶ 18 (no reasonable probability exists that the verdict would have been different if the irrelevant evidence had been excluded).

¶ 105        In *Tompkins*, our supreme court found that evidence of a codefendant's drug possession was completely irrelevant and unfairly prejudicial. *Tompkins*, 2023 IL 127805, ¶ 59. However, the court agreed with the appellate court that, although the evidence was not duplicative of other evidence, reversal was not required, where no reasonable probability existed that the verdict would have been different if it had been excluded. *Tompkins*, 2023 IL 127805, ¶ 61. In addition, the supreme court noted that the prejudicial impact of the drug evidence was "greatly lessened" by the officer's immediate testimony that it was unrelated to the defendant. *Tompkins*, 2023 IL 127805, ¶ 61. Similarly, in the case at bar, the officer's immediate testimony that defendant was not involved in any of these events lessened their prejudicial impact and, for the reasons explained below, there is no reasonable probability that the verdict would have been different if it had been excluded.

¶ 106        In the case at bar, the State presented not one, not two, but three separate and independent eyewitness identifications. *People v. Conway*, 2023 IL 127670, ¶ 18 (it is well established that a "single" eyewitness identification is sufficient to sustain a conviction); *People v. Oliver*, 2013 IL App (1st) 120793, ¶ 26 (a single eyewitness identification "alone" is sufficient to sustain a conviction). Two of the witnesses knew defendant prior to the shooting, thereby reducing the risks often associated with eyewitness identification. In

addition, there was no allegation that any of these witnesses had a reason or motive to lie. There was no evidence that they had an issue with defendant or that they were trying to deflect suspicion from themselves. In that respect, all three identifications were untainted.

¶ 107    In addition to the three identifications, the State presented evidence of opportunity, proximity, and motive, which were all independent of the evidence that should have been excluded. Evidence of opportunity included testimony from defendant's own family and friends that he disappeared when the shooting occurred and reappeared shortly after it, reentering the house through the back door. Evidence of proximity included testimony from defendant's own family and friends establishing that he was less than a half a block north of the crime scene both before and after the shooting. Rebecca Olasimbo, Tiffany's friend, stated that she observed defendant shortly before the shooting, as he exited the front door of the Woodson home, located just south of the Berquist home. Her statement dovetails with the testimony of Berquist, who observed the shooter jogging southward toward the corner, while muttering "I'll kill you." Evidence of motive includes evidence establishing that defendant was shot in April, that his cousin had just been stabbed, that defendant's sister told defendant about the stabbing only minutes before the shooting, leaving no cooling-off period, and that the shooter stated, immediately prior to the shooting, "which one of you," which could be a reference to "which one" stabbed Usher.

¶ 108    With three separate and independent identifications untainted by motives to lie or to deflect suspicion—plus evidence of opportunity, proximity, and motive—we find that there is no reasonable probability that the verdict would have been different if the irrelevant evidence had been excluded.

¶ 109                                    III. CONCLUSION

¶ 110          In conclusion, we do not find defendant's claims warrant reversal.

¶ 111          Defendant claimed, first, that the State failed to prove beyond a reasonable doubt that he was the shooter, where the principal evidence connecting him to the shooting were three identifications and all three were allegedly unreliable. After carefully considering all five *Biggers* factors, we cannot find that these three identifications, particularly when considered together, were so unreliable that a reasonable juror could not find proof beyond a reasonable doubt.

¶ 112          Defendant claimed, second, that, while the State's gang evidence was relevant to the extent needed to show his gang membership and the gang conflict at the time of the shooting, it was excessive, where the State presented numerous incidents that defendant was not a part of. While we agree with defendant that the evidence was excessive, irrelevant, and prejudicial, we also find that reversal is not required where the result would have undoubtedly been the same without it.

¶ 113          Affirmed.

*People v. Woodson*, 2023 IL App (1st) 191353

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 12-CR-20136; the Hon. Lauren Gottainer Edidin, Judge, presiding. |
| **Attorneys for Appellant:** | Douglas H. Johnson and Joanna P. Kluzowska, of Kathleen T. Zellner & Associates, P.C., of Downers Grove, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Hareena Meghani-Wakely, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |